Limited. And let me add, I mean that not in the context of this case but in the context of all the cases. Okay, we ready? Mr. Haug, whenever you're ready. Good morning, Your Honors. Ed Haug for Shire. The appellant here. We ask for this panel to engage in claim construction and review two instances of claim construction by the district court here. One with respect to matrix and the other with respect to in claim one in the phrase inter-lipophilic matrix. Well, the parties sorry, the parties stipulated to the definition of those claims terms. So your argument is that what the district court changed that definition when he applied it in an infringement context? Correct. And he did it at the at the insistence really of the defendant here, Zytus, at trial. Both parties here agreed early on that matrix was a macroscopically homogeneous structure in all its volume. And similarly, lipophilic was poor affinity for aqueous fluids. And when we had a Markman hearing in this case, which we did, those terms were not disputed. They were accepted by the court based on the parties agreement. The district court identified three independent grounds for finding non-infringement. Would you agree with us that if we affirm the district court on any of those three grounds, you lose? Yes, I think if you affirm the district court on any of those three grounds, correct. I think that the first two grounds are one is on matrix and whether or not the claim construction by the district court was correct or not. That's number one. If this court were to agree with that claim construction, then findings of fact were made by the court. If the second one would be lipophilic, the court went beyond what the parties agreed to, which was poor affinity for aqueous fluids. It went on and added limitations that were required to meet that claim element. And so we, of course, believe that that was a legal error and should be corrected. And on that basis, too. I'm sorry to interrupt, but just to follow up on Judge Walloff's question, we're still left with a third alternative conclusion with respect to the melting point that doesn't involve the questions of law that you're trying to present to us, right? It does not involve questions of law as to claim construction. It does involve a question of law as to the misapplication of the doctrine of equivalence as to that element of the melting point. In other words, what the district court did here is the district court did not do a proper doctrine of equivalence analysis. It did not compare the accused product with the claim element where the court found no literal infringement. And the reason for that is because the court compared 90 degrees, below 90 degree melting point, which is the claim language, with the finding of a 125 degree melting point for a different ingredient or excipient. In other words, the 125 degrees is with the hydrous form of magnesium stearate. That is not the Zytus product at issue here. The Zytus product, by agreement of Zytus, is in the hydrated form of magnesium stearate. So the proper doctrine of equivalence analysis should have been comparing the claim with the Zytus product, which is in the hydrated magnesium stearate, or contains a hydrated magnesium stearate excipient, and In the red brief at 29, Zytus says, Scheier truncates and inaccurately represents the evidence presented to the district court, referring to your reproduction of certain images. And I've got both briefs in front of me, and they clearly are different. Explain to me why you selected to reproduce these versions of the images. Well, I think those are the ones we thought were most And again, Your Honor, if I may, the problem here has also been matrix. While the parties agreed to the construction until trial, it's a macroscopically homogeneous structure in all its volumes. That language comes right out of the What's now happened in this trial is Zytus said, well, structure requires certain limitations. You have to connect. There has to be a physical connection between various different molecules. That's not in the claim term. Structure isn't even in the claim. That nowhere appears in the claim. Yeah, but the agreed upon claim construction included structure, right? And that appeared in our earlier opinions, too. So that wasn't just made up by the district court. No, the word clearly appears in the specification itself. It says a matrix is a macroscopically homogeneous structure in all its volume. The dispute, however, trial became what is meant by structure. And the district court accepted the trial testimony of Zytus' expert saying that that requires a connection between the molecules and that, therefore, if there is no connection, there can be no because you agree with all three. You have to win on all three. Yes. So in the blue brief at 28, you argue the district court, quote, did not apply appropriate weight to the evidence of lipophilicity. We can't independently reweigh the evidence on appeal and you don't identify specific errors in the district court's discussion of the party's evidence. I'm looking at 27 to 32. If we disagree with the argument that the district court improperly imported limitations into the agreed upon construction of lipophilic, aren't you just inviting us to reweigh the evidence? No, Your Honor. I don't. Our position clearly is that there was a mistake in error of law in the construction of lipophilic. You cannot do a proper infringement analysis, which is why we think that would require proper construction of lipophilic and that a reweigh is necessary. So as to that, you argue the district court imported additional limitations citing one sentence in which the district court was describing, quote, multiple infirmities of your expert's experiment. The district court considered and rejected your argument that the granules must be lipophilic because they include magnesium stearate, which imparts lipophilic properties into the granules by virtue of their own lipophilicity. The district court, in fact, found the granules themselves were hydrophilic in nature. These findings don't depend upon any limitations other than the agreed upon construction of lipophilic as poor affinity towards aqueous solutions. I respectfully disagree that that's the case. Those findings go to the additional limitations that were added to the claim term lipophilic, namely that it has to have a lower affinity than the outer hydrophilic matrix, for example. That is nowhere to be found in this patent. That language isn't there. It's not in the prosecution history. It's nowhere. And in addition, the district court said that it had to have below average affinity. Well, we don't know what that means because that's not a defined term. That's not in the patent anywhere. So what the court did is it set up the obstacles that had to be overcome to show infringement and did so by an improper claim construction by adding these limitations, these additional limitations to what the parties had agreed to. The parties agreed to it has a poor affinity for aqueous fluids. And the district court actually found, in its opinion, that the testing by Dr. Hoyg in this case did show that the... Did he test Zytus' product? He tested a simulation of the product. He did not actually test the product. We're talking about getting inside granules and all. So he tested and compared the affinity for aqueous fluids between pure mesalamine, which is about 90% of this entire formulation. He compared pure mesalamine with the affinity for aqueous fluids in a compact that has mesalamine plus magnesium stearate plus colloidal silicon dioxide, which is what is in the Zytus product. I don't think there's any problem with that. In prior development, V. Watson, we previously determined that the inner lithophilic matrix must be, quote, separate if not distinct from the proposed interpretation, which would permit the inner lithophilic matrix to have a similar affinity to the outer hydrophilic matrix, run afoul of our requirements that they be separate, if not distinct. The prior Watson decision found that they had to be separate. And in fact, we agreed with that. What it didn't find is that they had to be distinct, depending upon how you define distinct. Because distinct is not a word that appears in the patent either. And so the Watson court found that they had to be separate. They are separate here. Clearly, we believe they're separate. And the inner lithophilic matrix, which consists of the magnesium stearate in this case, is clearly lithophilic. And we believe the evidence that was presented to the court through Dr. Hoek's testing, if using the correct claim construction, which was agreed to by the parties, does show that. The outer hydrophilic matrix is different. It has hydrophilic excipients in it. And the affinity for fluids is very different. It has an affinity for fluids. And so it's almost the opposite. If you follow me, I think that was clear. So, and back up. We do need to win on three fundamental errors made here. Two on claim construction. This court, respectfully, I submit, should engage in the proper claim construction of matrix and lithophilic because it's now been put in dispute by the parties. It was not in dispute before we got to trial. It became a disputed trial. The district court relied on Zaitis' expert testimony, together with a patent on, which is Appendix 42, actually. I conclude that a collection of unconnected molecules distributed throughout another substance is not a matrix make. I credit the conclusion of Zaitis' infringement expert, Dr. Umesh Banekar, that in the context of the 720 patent, the term structure means something more than the arrangement of particles dispersed throughout a granule. So one, the court is clearly basing this claim construction on the testimony he heard at trial, which was contrary to other testimony he heard from Shire's expert, but he accepted this testimony. And this is clearly claim construction. There is nowhere in a patent where you're going to find unconnected or connected particles. None of this is there. It seems to me that you're doing the same thing with Melting Point. It relates to what the district court did. On Melting Point 1, we are taking a position that it was clearly erroneous on the factual findings, but I think that... Well, you're saying he relied on the other side more than he relied on us. But he relied on the other side based on the wrong test. It was a hot... He invested on DSC, which he also said was the differential scanning calorimetry, which was the right test to use to determine Melting Point. He then pointed to HSM, which was used by Zytus, and that's how we got to this 125 degree melting point. And he found that Shire didn't carry its burden in showing that the melting point of the Zytus product was below 90. But there's nothing in this record that says the melting point of Zytus' product is 125 because they don't have that product. They don't use an anhydrous product. And so the question really is, whatever Zytus' product is, is that equivalent to below 90 degrees? And when you look at the district court's opinion, it really looks to the doctrine of vitiation and says, if the claim says below 90 and if I'm looking at 125, it's game over because it's too big a gap, too close to the doctrine of equivalence. And you think that's legal error? I think it's legal error because the 125 is irrelevant. That's not their product. Then it becomes a factual question. Your Honor is absolutely right. It is a factual question, but that factual question was never determined by the district court. In other words, district court didn't engage in that fact finding, did not look at the Zytus product versus the claim. And there was expert testimony showing function way result. He didn't even touch on that. Just said I don't have to do it because of this vitiation doctrine. It's too far a gap. Why don't we keep your rebuttal and hear from the other side. I think it's still good morning. Good morning. May it please the court. I'd like to first address the melting point limitation on the two aspects. One is the findings of fact. Mr. Howe said that Judge Jordan relied on the wrong test. I believe that he's referring to the hot stage microscopy test, which is Zytus introduced into evidence, which was uncontested. Shire didn't present any evidence whatsoever on hot stage. Didn't put in, did not rebut Zytus' evidence. They don't even dispute that the evidence is correct. And what Judge Jordan did is Judge Jordan used the hot stage to weigh the evidence of a different test, DSC, which everybody admits is a proper test to a judge, the melting point of magnesium stearate. And although Shire faults Judge Jordan for actually looking at hot stage in conjunction with DSC, Shire actually submitted into evidence and its expert relied on several scientific references when in fact experts in other fields of melting point relied on DSC. And I can refer you to Appendix 10239, 10240, and 10253. What Judge Jordan did is he looked at hot stage along with DSC, along with scientific references. It was a morass of scientific, highly technical evidence that went in through multiple experts, maybe a half a dozen or so, stretching over hours, if not days of testimony. And he weighed the credibility of that evidence and he made a factual determination that Shire failed to prove a melting point below 90 degrees C. Judge Wallach, as you pointed out, what Shire wants this court to do is look at this evidence all again and put its thumb on the scale and decide it should be weighed differently. And that's not an appropriate exercise for this court. I didn't say anything about thumbs. Okay. Fingers. How's that? On the scales of evidence. And this court made clear in previous cases, and I'll talk about the biotech case, which is 267 Fed Third 1325 at 1330 through 31. Even when there's a reasonable range of differences on scientific opinion, the resolution of that difference based on the weight and credibility evidence is the province of the trier effect. There is simply no clear error in the melting point determination that Judge Jordan made.   Shires mold meshing things together because they don't want to go through the element by element analysis that the death doctrine of equivalence requires. And the doc that Judge Jordan went through during the trial, Judge Jordan recognized the DOE is done on an element by element basis. And that's what he did. Now, when we talk about the melting point limitation, that's there's a more cruise group. I think Chief Judge Proce, you were involved in a prior case involving the mark cruise group. In this case, Judge Jordan recognized that the mark cruise group creates two limitations. And this is a paragraph 49 of his findings of fact. And I don't hear Shire disputing that creates two limitations. One restricts the type of compound and the second limits the melting point. All the evidence that Shire has ever offered on DOE talks about the first limitation, the type. For example, it's a long chain fatty acid. Judge Jordan gave them that. Judge Jordan actually filed in favor of Shire on the type of compound. So that you've got to put that to the side. The second question is on doctrine of equivalence is what's the melting point. And for melting point, that falls into the numeric range cases that both sides have cited to this infringement, a numeric value to fall into a range. To show DOE, this court has ruled, you have to show that the accused number that's outside the range is actually equivalent to a number within the range. Both sides have cited cases to that effect. So for purposes of the melting point separate element of this claim, it was incumbent upon Shire to show a melting point outside the below 90 degree range that was somehow substantially different or satisfied the function way result test to a melting point below 90 degree C. They never even made an effort to do that. There's no evidence in the record at all that wasn't presented to Judge Jordan and it's not presented to you now. Judge Jordan could have stopped there. But instead he said, okay, in the numeric range cases, I'm supposed to look for a number outside the little infringement range to compare it to a numeric value inside the little infringement range. The only number out there was 125 degree C. Because what Shire did is Shire went all in on little infringement. They went all in. They tried to prove 82.5. Judge Jordan found and there's no error of fact that there's no little infringement. After that, there was nothing left. So what Judge Jordan didn't say, let's give him the benefit of the doubt. Let's try to find a number outside the range and see whether it's insubstantially different from a number inside the range. Well, the only other number that left was the number that we put into evidence, which was 125 degree C. That's why Judge Jordan looked at that number. That was the only option that was given to him. In fact, it wasn't even given to him. He searched the record to find it. And what Judge Jordan did said, well, wait a second. There is no evidence that 125 degree C is insubstantially different to a numeric value below 90 degree C. Therefore, there can't be infringement. It can't that be vitiation, which is vitiation goes back to this court's precedent. And I'll cite the Deere and Company case 703 Fed 1349 and 1356, which is vitiation derives from the requirement that the doctrine of equivalence must be applied to the claims on an element by element basis so that every claimed element of the invention or its equivalent is present in the accused product. That's exactly what Judge Jordan was doing. He was looking for the below 90 degree C element to make sure it wasn't read out of the claim. So his reference to your friend's argument with respect to the first two issues, the other two alternatives, that the court may have committed legal error by changing, by revising the claim. We'll switch to lipophilic then. Judge Wallach, as you pointed out, the place where Shire argues that Judge Jordan actually imported limitations into lipophilic isn't that. It is actually a litany of finding of facts that Judge Jordan made to rule that Shire failed to carry its burden of proof of lipophilicity. But one thing before we get to that chief judge process, I'm a little confused as to where we're going on this whole lipophilic argument because as we briefed, and Shire doesn't dispute, what happened in trials, they had two theories going here. They had one, the matrix is the granule, and one the matrix is dispersion, which I'll get to in a second on the structure. So they had these two competing theories, and Judge Jordan called them out on that. What he found was, and we'll get to it in a second, that this dispersion isn't a structure. But he said, okay, I'll give them that. Assuming argument, let's go to a granule now. So you tack to the granule, I'll look at whether your granule is a structure. All the lipophilicity evidence that they put in went to whether the granule was a structure. The lipophilicity of the alleged granule. Not the alleged matrix, the dispersion, which we'll talk to in a second. So in many ways, I'm not sure what the purpose of this is, because now I understand, Shire's all in on their distributionism matrix theory. So we'll go into this in detail, but it seems to be a bit irrelevant because if you look at the evidence, it all goes to the granule. And back to the findings of fact on lipophilicity and Mr. Howe's arguments on that. Judge Jordan applied the agreed construction and found, as a matter of fact, a number of things that aren't contested. Number one, he found that Dr. Hoyt disavowed his test. He no longer stood by it, and this is to your question, Judge Wellick. He disavowed that his test is representative of a test on the Zytosin in the product. That's at appendix 22 to 23. But he did say that Dr. Hoyt's test demonstrated that Zytosin's product exhibits some resistance to the penetration of water relative to mesalamine. He did, but he put a little gloss on that. What he said is he found that the mixture of mesalamine, colloidal silicon dioxide, and magnesium stearate opposes some resistance or has some resistance to water. It's important for two reasons. One is colloidal silicon dioxide is outside the Marcouche group. That's a hydrophilic substance, and I know that issue's in front of this court now. So if colloidal silicon dioxide is part of that mixture that opposes resistance to water, they fall outside the consisting of language and violate the Marcouche group. We briefed that issue as an alternative issue on this appeal. You don't need to reach that because I agree there's three other bases to do it. But if that's the finding that's important, I think we're going to have to grapple with that too. The second thing that Judge Jordan found though is although it has some resistance to water, that's not enough to show poor affinity. I mean, leaving aside all the other deficiencies in the test. And I think that the patent teaches that both matrices oppose penetration of water. We have those citations in the record. So if you're looking to oppose some resistance to water or give some resistance, I don't know how you're going to decide what's a lipophilic matrix and a hydrophilic matrix because both of those have those standards. Really, when Shire's trying to put that language back into the agreed construction, they're trying to expand it. They're trying to equate poor affinity with some resistance when that was never the issue. It was accepted that it was poor affinity. And trying to expand it not only is beyond the claim construction, it also would just, again, it doesn't make sense in the context of the patent. Some of the other things that Judge Jordan ruled on lipophilic. Your time is brief. Can you hit structure? I can certainly hit structure, Your Honor. Can you identify any intrinsic support that the court cited for its finding that the matrices have a structure that is something more than an arrangement of disconnected particles. We don't think that the court engaged in claim construction exercise. In fact, you can read Shire's briefs. They don't say exactly what it is that the court construed the claim to be. In fact, in the footnote to the provision that Mr. Haug cites, Judge Jordan expressly says, I'm not making a decision on this. The judge didn't need to because if you read the opinion, he found it's devoid of any structure. On multiple occasions he says there is no structure whatsoever because the theory is 0.33%, one third of a percent of this mixture forms some sort of structure because it's dispersed within it, as Judge Jordan said, it's strewn throughout the granule. So he didn't need to go as far as to make a construction. And by the way, no one ever asked him to. There was a debate at trial certainly on how to prove structure. When Mr. Haug suggests that we invited the judge to do that, that's not fair and that's not true. What our expert did is he went through and he submitted technical references to the patent office to show characteristics, that's how they described it in the prosecution history, of a matrix system. So what our expert did is he walked through those illustrations to show to Judge Jordan this is what a person of ordinary skill in the art, and we can get beyond that, this is just what references, technical references, would show what looks like a matrix in a pharmaceutical form. I'm looking at page 29 of your red brief, and I raised this with Mr. Haug. Yeah, there were some games playing there. At the time, this dealt with one of the arguments that Shires raised in the past that just because it's only 0.33% doesn't mean it can't be a structure because there can be a low volume of that. Again, Judge Jordan did not just rely on the volume, he relied on any lack of structure at all. What Shires tried to do was, Shires frankly cut and pasted some of these exhibits to try to create the illusion that the technical references in the prosecution history actually showed very little lipophilic matrix forms. In fact, the vast amount of it was active. But when you go back and take a look at the references as we cut and pasted them in the brief, it actually shows quite the difference. It shows that it's much more dense in terms of the matrix formers, and they also took out words that are inconsistent with how our expert viewed the illustrations and the evidence of a matrix structure in particular. And so we thought, again, that sort of evidence, Judge, of them trying to reach so far to try to find an argument in basis of their structure point where they had to frankly misrepresent the evidence that Judge Jordan was presenting. But Judge Jordan wasn't required to. He didn't need to make a claim construction. Most importantly, he was never asked to. In fact, now, as I understand it, Shires not even asking for a remand. Shires asking this court to engage in a derivative claim construction of a non-claim term that no one ever asked the court to do. I'm not aware of any precedent where this court has done that. Shires certainly hasn't cited any. The one case they cited when this court reviewed a derivative claim construction, it's because it was presented to the district court, the district court made a ruling, and that was then presented to this court for review. I will end now as I'm out of time. But as you pointed out at the beginning, Judge Jordan found three independent bases for infringement. He made a very detailed opinion, findings of fact on melting point, 20 pages of findings of fact where he weighed all the evidence very thoroughly. There is simply no clear error, and there's no legal error as well. Thank you. Thank you. On structure, the court did engage in claim construction. You can see it in the opinion. He required there to be a connection of molecules and then found that the Zytus product didn't have that. That is a negative limitation that the court put into that claim term. That is a construction. I don't think it's the right construction, but that was a construction the court made, and once that construction was made, then there's a finding of no infringement because it follows. He said the Zytus product is not connected. So what we have taken in our appeal brief here, we say the correct claim construction is there is no limitation to the word structure requiring such a physical connection, and there is evidence in the record that shows the Zytus product is an arrangement of molecules, in this case magnesium stearate. I believe the court should construe the word matrix because it is in dispute by the parties, and the macroscopically homogeneous structure in all its volume. The structure is the matrix. The structure is not the volume, and there's been confusion in this case, and others, but there's been confusion in this case maybe as to is the matrix the volume or not? It can't be. The matrix is the structure. The structure is not the volume, and therefore, with that correct claim construction, the inner lipophilic matrix is not the inner region of the granule. It is the magnesium stearate, which is a collection of molecules of magnesium stearate that then exhibit lipophilicity. That, we believe, is the correct claim construction of matrix. As to lipophilic, again, the parties did agree to poor affinity for aqueous fluids. The court, as Judge Wallach pointed out very aptly in paragraph 46 in appendix 23, he said, I do credit it to a limited extent. He's talking about the testing that was done by Dr. Hoig. I find that his test and testimony demonstrated that the addition of magnesium stearate and CSD to misalumine results in some resistance to the penetration of water. Some resistance to the penetration of water is all you need to satisfy the claim limitation, to satisfy what the patent says, poor affinity to aqueous fluids, what that is. And that comes right out of the patent itself, in column one, I think lines 17 to 21 or thereabouts. One last sentence is doctrine of equivalence. Again, the 125 is not the Zytus product, and that is not the correct comparison. You can't compare below 90 with 125. You have to compare below 90 with the Zytus product. That was done by the expert. The expert, Foshari, did the function way result test, gave testimony to that import, but it wasn't considered by the court. Thank you. We thank both sides. The case is submitted. That concludes our proceedings for this morning.